Service No. 14-1743. And what we do is we have some additional questions that we want to follow up with from the last sitting that we had, I think on November 18th, if I'm not mistaken. And on that panel was Judge Slobider, who is now on inactive status, or status, that's my understanding of it. And so Judge Krauss has kindly agreed to speak. And with that, we'll begin today. Good afternoon, Your Honors, and may it please the Court. James Martin for the Appellant Duquesne Light. And with the Court's permission, excuse me, I'd like to reserve three minutes for rebuttal. That's fine. The Court has asked specifically about three regulations and the United Dominion case and inquired whether those regulations and that case justify a different treatment of the deduction or the loss allowance in this case. Of course, none of the parties to this point have advanced an argument that would have been based on those code sections or that case to disallow the deduction. So the question becomes with regard to those particular regulatory provisions and also another one that I may note to you later on, and that is, if there is a directional error of 1-1502-22, do they give directional arrows pointing for or against allowing the deductions here, the claimed losses? Well, two things on that, Your Honor. First, we think that if there's a directional error that comes out of either those code sections or United Dominion, it points firmly in the direction of the allowance of the deduction. Second, if these regulations and United Dominion overtake the analysis here, we would request an opportunity to brief those issues in expedited fashion, in a modified way, because we think this is a fairly complex analysis to offer on the fly. I'll tell you what, let's make it simple then. Within the next two weeks, if you and the government wish to submit something simultaneously, today's Tuesday, two weeks from today by 4 o'clock, two weeks from today, if you want to submit anything with regard to those, no more than 10 single-space pages. We would appreciate that. Thank you, Your Honor. So the point of United Dominion was not a tension between separate and consolidated status. It was, as I said, what do the relevant regulations require? And here, the relevant regulations are specific, and they provide for how this loss not only should be taken and be allowed... And the relevant regulation for you is... The relevant regulations for consolidated filers start with the basic definition of loss. That applies to every taxpayer at a separate level or consolidated level. And which regulation are you referring to? That would be 1001, which is proceeds minus basis equals loss. That applies to every taxpayer, whoever they are. After that loss calculation is made, though, the amount of the loss that's allowed for consolidated taxpayers is determined at the group level based on the provisions of Section 137, 1337D-2T. That was the specific regulation that the IRS pointed to, directed us to. It was in force at the time these deductions were taken. It provided a very specific method of calculating it. And the IRS said two things about that. That's the allowable loss, number one, for the consolidated taxpayer. And you're required to follow that regulation, number two, and we did. But that only addresses how you address stock loss. So what relevance does that have for a subsequent duplicative deduction based on asset loss? Well, because the asset losses, in reality, that's kind of a misnomer. The loss is taken on the value of the stock the second time. So that directs you to that regulation. The assets, in the end of the day, are the stock. The loss is experienced on the stock and at the group level or at the separate entity level. But that sounds like the same stock loss twice. No. That sounds like an argument for recognizing it as a single loss, not a loss twice, which is, I thought, the position that you're espousing. So let me come at it another way if I can. 337D2 talks about the loss that's allowed to the consolidated taxpayer at the group level where that loss, the asset, the stock, is experienced at the particular time based on the sale and the disposition, which is what we did. The basis for that, then, is computed under 1.150232 under the regulations. That's the complete calculation. We submitted that to the IRS, Your Honor. They signed off on it and agreed with it, at least in terms of it being regulatory compliant. They said, You're right. You did calculate this loss correctly under 1.337D2. Your basis adjustments, we signed off on under 1.502-32. So to this point, we're completely regulatory compliant. Did they say that with respect to the asset sale as well as the stock sale? Yes, the asset sale. So your answer is it sounds like then even if there's a regulation that specifically blesses the stock deduction but doesn't specifically bless the asset reduction, you're saying that the service itself blessed the transaction in its entirety? Is that your argument? Well, what I will say is that the service blessed expressly, that we properly took what we are now calling the asset deduction under the stock loss regulations because the asset deduction, in fact, was a loss on the value of stock. It wasn't a sale like the first one that was a stock sale. The asset loss was loss on stock. The IRS said, You're right. 1.37D2 and 1.502-32 account for that loss, the calculation of it, and the basis fully and completely. The reason that they said that we can't take the loss was not because of the regulations. There's never been a regulatory noncompliance issue raised by the IRS. They said it was ill felt. Right, right. But they could still win here if we deem the regulation argument to be a winner because you're well acquainted with the firm on any grounds. Okay, so let's look at those sections as they relate to the ones we relied on. So start with 10.16, the first section that the court cited. There's a consolidated return regulation that says there shouldn't be duplicated losses and you, the taxpayer, should make sure that your basis adjustments don't duplicate losses. The basis adjustment, though, is in 1.1502-32. That's where the calculation is made. We followed that basis adjustment, which is the duplicative issue, and the IRS signed off on our basis analysis. You're talking again about the stock. I mean, in some ways it seems like a red herring. You're making the argument that the IRS didn't pick up on this in its initial audit, but this isn't an estoppel argument. I mean, at the point they do raise it, there are a couple of different ways that, whether it's the initial disallowance of the stock, sort of the front end, or at the asset loss end, and the tax courts went forward and agreed with the argument that it was the asset loss deduction that was properly disallowed. So what regulation says that you're taking of that second loss, treating the entity as a separate entity, not on a consolidated basis, but a separate entity taking a second separate loss, what regulation expressly says that that is authorized? Okay, so starting with the 2001 transaction, that was a stock sale. Okay, and the value of the stock was determined. You sold what, about 4.17% of your stock? Yeah, I think it was. So the value was. Pretty big capital loss, right? Signed off on by the IRS as regulatory compliant because that sale, in effect, the asset at the basis of it was stock. The same thing is true here. The asset sales in 2003 result in losses on stock that the company holds, and those losses are taken at the group level because the regulations tell us that they should be. Unless the loss has already been taken because it was done at a consolidated level, viewing it that way the first time around. Right, but it would not have happened that way because of J. 1012J says that you compute losses separately at the taxpayer level for consolidated filers unless they're capital losses, that's sub J, or unless under sub R they are losses on stock allowances like this one was. And I might add, Your Honor, in 2002 we had a so-called asset sale, $59 million worth was the dispute then, and the IRS signed off on that under these same regulations I'm referring to. Let me understand how J. assists your position because it seems to say that, and we've got different regulations here, 1016 we can talk about, but now we're looking even at the calculation of loss, and we're told in those calculation regulations off the top that you don't treat, when you're talking about capital losses, you aren't treating these as individual entities. The losses that are taken at the outset should not include those. Those are left for treatment on a consolidated basis, which would seem to mean that you don't look to take them twice within the same entity. We agree with that, Your Honor, but these are different losses, right? 1016-6 says adjustments must always be made to eliminate double deductions or their equivalent. Right. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary's company's losses for the years in which consolidated returns were made. Agreed. And then you look at 1502-22. It talks about under B, losses, the determination under Section 1222, including net capital loss, net capital, net short-term capital loss with respect to members during consolidated return years are not made separately. Instead, consolidated amounts are determined for the group as a whole. Yes, and that's absolutely what happened in this case, and that is exactly what 1.337D2T direct group level and the basis calculation 1502-32 direct group level. The stock loss was taken on a different bundle of assets than the asset loss in 2003. So these are not double deductions, and in fact, no one has ever proven that they are. They were taken for different transactions for different reasons in full compliance with the regulations, which we were directed to by the IRS. Mr. Catterall noted that the last time we were here that I believe the numbers were that you put in 281 million and you took a loss, capital losses, or attempted to do so at 509 million. So you can see how an auditor might kind of blink at that. Well, the auditor might blink at that, but that formula which compared the losses the way that he did is not the formula in the regulations. In fact, it's not a formula published anywhere for the determination of what is a double deduction. What was the ultimate investment in AquaSource, do you know? No, not as I stand here. The numbers were 199 million in Round 1 and 50 million and then 150 million in the deductions in Rounds 2 and 3. The only time the IRS balked at our calculation under the regulations was in 2003, and it was not because we had somehow improperly treated this as a stock loss under inappropriate regulations, and that's because the regulations that we followed required us to do exactly what we did. That's what separates this case from Illfeld. That's what brings it within United Dominion. If the IRS doesn't like that result, what they do is they amend the regulations. They don't direct us somewhere to file and compute and then hang us up after the fact, and that, of course, was the message of United Dominion. Take it at the appropriate level, which we did. IRS, if you don't like that, change the regulations. That is also what brings us into Gottesman or Applied Research. Gottesman dealt with penalties, right? Gottesman was not confined to penalties on the analysis that we want, Your Honor, and the Applied Research case would be a better one to point to for the Gottesman principle. But the way that we took this loss, look at Wood's investment. It brings the same kind of loss that we have here into 1502-32 for the basis adjustment, and it rejects the IRS's argument that 1016 trumps that in any fashion. So we are regulatory compliant, which means that Ilfeld can't land on us. We are regulatory followers, which means that the Gottesman principle should take hold. We certainly can't affirm on the basis of these regulations if we pivot to them because the court doesn't have the record to declare that these are, in fact, a double deduction. Mr. Martin, I asked you at the outset what was the regulation, the specific regulation on which you rely for the proposition that the second losses, the asset loss deductions were proper. Right. What regulation are you relying on to take that second deduction as proper? I thought your answer was it's actually a stock loss, not an asset loss. Is that not right? This asset is a stock. The regulation that I am relying on refers to the loss in the value of that asset, the stock, on the basis calculation that the regulations provide. The regulation that specifically controls this, Your Honor, is 1.337D2T, and the IRS, that's the temporary regulation that was passed expressly to deal with this situation, the IRS called... Now, that proposed regulation, which came out in March of 2002, governed stock losses. Yes. It didn't go into effect until March 2002, three months after Duquesne sold its Aquasource stock. No, that was the regulation in force at the time of the 03 stock sales that are in dispute now. Whoa, whoa, whoa. 1502-35T governs stock sales, does it not? It does, but the reg gave us an option on these sales. We could go either of two ways. One way was 1502, as the court mentioned, the other way was 1.337D2, and the IRS, in its notice, in its preamble to the regulations and the bulletin, made it express and clear that that was the option. But neither of those options addresses how the asset loss should be subsequently handled. But the asset is the stock, and it does expressly say how to do that. What if it weren't stock? What if the asset were a plant, a physical plant? Then would you concede that the second deduction would not be valid because it would have to be deemed duplicative? Well, I can't go there, Your Honor, and I don't mean to avoid the question, but what you do when you're a consolidated filer is you've got a lot of deductions going on or calculations at the separate entity subsidiary. No, I understand that, but I want to press you, Mr. Martin, on this hypothetical because to Judge Krause's question, as I understand your argument, you're saying, look, we can point to a regulation that authorized the deduction for the stock loss, correct? For the 2000 transaction. For the 2001, 2002, and 2003. So you can point to a stock regulation, and conversely there is no regulation that would authorize that treatment for an asset loss, correct? Sale of assets that results in a loss. Well, Your Honor, I don't know that as I stand here. Well, you can't cite one. Well, I can't cite one because I don't think until right now I didn't think that was the issue. Well, you just cited a stock one. I did. All right, but you haven't cited an asset one. I can't find an asset one. I don't think my colleagues can. And the reason I'm trying to press you on this is that if I'm correct that there is not a commensurate regulation that authorized you to treat an asset sale the way it authorized you to treat a stock sale, then it would seem that our decision in the case comes down to whether or not we deem the 2002, 2003 sales to in fact be asset sales or stock sales. Am I missing something? No, I actually understand the litany. First of all, it would be an incongruous situation, it seems to me, as a matter of statutory construction. If the IRS could issue a set of regulations that specifically points a taxpayer for a transaction, which is a loss on stock like this one with a basis calculation attached to it and says this is the allowable loss and this is the calculation that you are required to make, after all the consolidated returns are expressed in that regard, we make that calculation and then the IRS comes back subsequently and says, yeah, that's okay that you went that route, but we can't find an asset loss statute that covers this and that's what you should have done. But the burden is not on them. It's on you. And the regulations, first of all, the text of the code says a deduction for any loss, that is a single deduction for a single loss, and the regulations, even assuming there's not something specifically on point as to the handling of the subsequent asset loss, Section 80A says, well, then you look to other law, other code and law, and we look first to the more specific before general. The more specific is 1016A, or 6, which states the general rule that you don't take duplicative losses. And the way that you stop a duplicative loss is to do the basis calculation, which that regulation directs you to. We have a specific basis calculation regulation here, which determines the stock loss in this case, and we applied that. So it's not a duplicative loss? It's not a duplicative loss, and I want to make the point again that the burden to prove this was a duplicative loss for purposes of Rule 56 under summary judgment was not on the taxpayer. We had a regulatory compliant set of deductions, which did not trigger any double deduction consideration. If the IRS believed that there was some ad hoc analysis that turned this into a double deduction, that burden was on them. But I want to also emphasize that there is no proof, none in this record, that this was in fact a double deduction. The bundle of assets that Duquesne had in 2001 when the stock sale occurred, and the bundle of assets that they had in 2003 when the assets that were held by Aquasource and the stock transaction was done then were different. And unless you trace from that first loss to the second one, you cannot tell, as a matter of fact, whether these deductions were taken for the same loss. The IRS resisted doing that and won't do it because they said, at least prior to right now, 337D22T doesn't require that, and it doesn't. That's probably a good segue for us to hear from Mr. Catterall. Thank you. Thank you. May it please the Court. I'm Arthur Catterall of the Justice Department on behalf of the Commissioner. And before we get into the single entity, separate entity issue, let me first just talk a bit about whether these were substantively duplicative losses, I mean the same loss. And just a couple of minutes ago, counsel said it's a whole different pool of assets. And at the November argument, he argued that between the date of the stock sale, which was 12-31-01, and the date of the last asset sale, which was July 31 of 03, quote, a hundred entities had been acquired that are going concerns that are now added to that asset pool, end quote, so that, quote, it's not the same pool of assets, end quote. That's on page 18 of the transcript. And that's simply not true. If you look at page 3 of the tax court's opinion, which is JA-7, and as reflected in Duquesne's own tax court petition, which is at JA-78, Aquasource stopped making acquisitions in 2000, long before the 2001 stock sale took place. So there are no additions to the asset pool after the stock sale. It's the same pool of assets. And so there's no need for a remand to determine the amount of the duplicated loss. And I would just reiterate that we know that the entire $199 million stock loss was duplicated precisely because, as I believe Judge Ambrose just mentioned, Duquesne admits that the group claimed $509 million of Aquasource-related losses based on a net investment of only $281 million. Now, that creates what's called an excess loss account of $228 million, and Duquesne also admits that that excess loss account was eliminated with no tax consequences when Duquesne ultimately liquidated Aquasource in 2007. So on the issue of whether these are substantively duplicative losses, I don't see an issue. I honestly don't. On the issue of single entity versus separate entity treatment, we've always maintained that the Ilfeld doctrine is clearly based on single entity treatment. Would you agree that Ilfeld is essentially an interpretive principle as opposed to a substantive? It may be a distinction without a difference. It's almost like a hybrid. I mean, it seems to have some substantive aspects, but then it says, unless there's a clear declaration of congressional intent to the contrary. So it's almost like a hybrid. But I look at it as more than just an interpretive principle, although it has an interpretive aspect to it. Letting aside Ilfeld for a moment, can you address the significance of the calculation guidelines and 1016-6? Certainly. Well, first of all, 1016-6 was first promulgated. That language first appeared in regulations in 1935, which was one year after Ilfeld came out. And before Pacific Lumber in 1936. I thought Pacific Lumber was also in 1934. I thought it was the same term. Maybe you're right. I'll check. You can go ahead. And since then, we've had these investment adjustment rules that were implemented. And those really, and I think the IRS would tell you this, the investment adjustment rules, for the most part, displace that 1016-6 in the context of consolidated returns. I think that rule, that general rule in 1016-6, has applications outside of the consolidated return context. But, I mean, and that's one reason we didn't rely on that regulation. But the tax court itself has repeatedly discussed it in the context of consolidated returns, in Wyman Gordon and Woods and CFI, hydrostatic, and asked the question whether the specific regulation that was being relied upon to take another deduction, whether that was more specific and, therefore, trumped 1016-6. Here, we've been asking what is the other regulation on which appellant relies. And, I mean, that's one way this case is different from Woods' investment and the other types of cases. This is not a basis adjustment case. This is a loss disallowance case. And there's no formula in the regulations for, you know, that Duquesne affirmatively applied in determining that they could take these losses. And, again, okay, the counsel is pointing to 1.337D-2T. There's two rules, and I believe Judge Ambrose mentioned the other one is 1.1502-35-T. Those are two different rules aimed at two different problems. 3.337D-2 is that disallows a loss on the sale of stock of a subsidiary unless the taxpayer can establish that the loss was not attributable to increases in the basis of the stock of the subsidiary resulting from prior asset sales by the subsidiary of appreciated assets. That's a completely different problem than what we have here. Here, obviously, AquaSource's assets have decreased in value. So 3.337D-2T just doesn't apply to this case. Really, it's the dash 35T. That's the rule that says that disallows or suspends a loss on the sale of subsidiary stock if the subsidiary holds devalued assets. But it only applies if after the sale the subsidiary is still part of the consolidated group. So that's the regulation that would have disallowed this loss on the Lehman Brothers transaction if the effective date had been two months and seven days earlier. As far as the 2002-2003 asset sales, I don't know if the record is crystal clear on this. I mean, I know that some, if not a good chunk, of those 2002-2003 losses were from sales of the stock of lower-tier subsidiaries. But I was under the impression that at least some of it was hard assets. I don't know the amount. But my understanding is – If we don't think this case is governed by Ilfeld and we think that the case comes down to a question of whether or not a regulation authorized the action, would you agree that to the extent that the 2002-2003 sales were sales of stock, that it was authorized? And to the extent it was a sale of assets, it was not authorized? No, I wouldn't say it was affirmatively authorized. It wasn't disallowed. Well, if there was a regulation that they've pointed to, is there not? A regulation that specifically authorized the treatment that they gave to the 2001 sale of stock? To the – right, right, to the 2002. Right, so to the extent they sold stock in 2002 and 2003, why wouldn't the same analysis apply to that that would have applied to the sale of stock in 2001? Well, for one thing, 2002 and 2003, you've got this –35T. I mean, you've now got two different rules. It now came into effect on March 7th of 2002. Right. But, I mean, the point is, I mean, the regulations did not prohibit these deductions in 2002 and 2003 to the extent they were attributable to stock sales. So then if that's the case, and some of these sales in 2002 and 2003 were stock and some were assets, then a remand would be required to sort that out, if we don't accept your Ilfeld argument. Obviously, if we accept your Ilfeld argument, you win across the board. But am I correct that if we don't accept the Ilfeld argument, then a remand would be required to sort that out about the 2002-2003 transaction? I think if you don't accept the Ilfeld argument, a remand is necessary for other reasons as well. And what are those? Because the IRS, the alternative argument is that that 2001 Lehman Brothers transaction lacked economic substance and should be disregarded. Was that an argument you made at the tax court? Absolutely. I mean, it's the alternative argument. And the summary judgment was on the Ilfeld issue. But, you know, if Ilfeld is held to be inapplicable, then there's the economic substance argument, there's a couple of other arguments having to do with how that 2001 stock loss was calculated. Ilfeld and Pacific Limber obviously have not been overruled, or are cases. Grief and a national casket that followed. But I thought at the outset of your argument you were pointing out that language, the principle of 1016-6, followed directly from Ilfeld. That is, it is a regulatory codification of the Ilfeld principle that you don't take double deductions. If that's the case, then even setting aside, or before we turn to case law, don't we have in the regulations a principle that would preclude the allowance of the second set of losses that's really on the same basis as the 2001? Well, again, this 1016-6 is a basis adjustment rule. And the basis adjustment rules apply when subsidiary recognizes gains and losses. They're taken into account. That has consequences for stock basis, for the parent's basis in the subsidiary stock. The reason this case is a little different is that the losses that are being claimed again in 02 and 03, those losses are only recognized when the stock is sold or when the assets are sold. So there have been no prior basis adjustments that you would have that would be called for under 1502-32. And I guess you could call it its predecessor, 1016-6. So 1016-6 says adjustments must always be made to eliminate double deductions or their equivalents. And what does the next sentence say? The next sentence goes on to talk about a more specific, perhaps, example. But doesn't that general statement at the outset state a rule that has application in the absence of a more specific regulation? Well, again, I think the more specific regulations for basis adjustments are the investment adjustment rules in 1.1502-32. And, again, those apply to recognize gains and losses, operating losses and things like that, while the sub is a member of the group. Here you've got assets that are devalued, but you don't recognize a loss until the asset is disposed of. So the investment adjustment rules don't catch that piece. So, I mean, again, I don't look at this as a basis adjustment case because basis adjustment is governed by dash 32, and that applies to items of gain and loss that have been recognized while the sub is a member of the group. But the loss disallowance rule would have applied. With the temporary regulation in place, we're left with the calculation guidelines that say leave capital losses until consolidated treatment. Right. And then there's nothing that would appear to apply to how the asset loss, the subsequent duplicative asset loss, ought to be treated. Under those circumstances, ADA says you look to other provisions of the code or the law. Now, I understand part of the law that you would point us to is Supreme Court precedent. But part of the law also would seem to be the general principle against duplicate deductions stated in 10.16.6. What's wrong with taking that approach, which might support your position just as well? Well, because I think what, if I can find it here, on the bottom, of course. Join the club. Okay. Adjustments must always be made to eliminate double deductions or their equivalent. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary company's losses for the years in which consolidated returns were made. That's the investment adjustment rules of dash 32. Well, indeed. But it's phrased in a way that suggests it's giving a specific example as that principle is applied for purposes of the investment adjustment rule. Would you say it has no applicability to the loss disallowance context? I don't think 10.16.6 applies. I mean, I think it's addressed to the same problem that the investment adjustment rules are addressed to. That's the dash 32 regs. And those are items that have been taken into account. Here we've got this unrealized loss that, you know, the value of the assets has gone down. And so nothing has gone into the investment adjustment rules yet. So I think it's two different problems. So your position is that the regulations, even this language, doesn't support your position? We're left simply with reference and application of Pacific Lumber and Ilfeld. Yeah, I don't think 10.16 necessarily helps us. I would agree that dash 11J and dash 12 and dash 22 support what we're saying. You know, dash 12J says that the members' separate taxable incomes are determined without regard to capital gains and losses. And dash 22 confirms that net capital losses are determined on a consolidated basis. So I think you can say that, as a technical matter, Duquesne's 2001 capital loss and Aquasource's 2002 and 2003 capital losses lost their separate identity once they were taken into account in determining the consolidated net capital losses for those years that were then carried back. And if that's the case, then, yes, you've got a single entity, the group, that's claiming duplicate deductions for the same economic loss. And I think our point is you don't really have to rely on dash 12 and dash 22 to get there. I mean, the single entity treatment here, in our view, is dictated by Ilfeld. But, you know, I think dash 12 and dash 22 gets you to the same place. And, again, the single entity treatment... The single entity treatment may be dictated by Ilfeld, but it's true, is it not, that there was no regulation in Ilfeld that authorized the tax treatment like the regulation that authorized the tax treatment of the stock sale in this case? Right. Yeah. Exactly. Your argument is, well, that's a distinction without a difference for purposes of Ilfeld. Ilfeld still controls, and I say maybe. I don't know. Yeah. I mean, again, you have this two-and-a-half-month gap between, you know, when the Rite Aid decision became final and the IRS announced that new regs were coming out. And I don't think... I mean, I draw a distinction between something that the regulations don't address as opposed to, you know... I mean, in the Woods investment case, I mean, you know, there were specific basis adjustments that were expressly called for by the investment adjustment rules, and the taxpayer followed those. And so the court said, we're not going to apply Ilfeld because, you know, the duplicate deductions were the result of basis adjustments that were expressly called for. Well, in Giblets, the S Corp taxpayer got a double deduction, and they just followed the rules, and Ilfeld is barely even mentioned in that case. Yeah, and I... I mean, you know, I think aside from the fact that... Not even in the majority. Not in the majority. Yeah, and... Giblets is not a consolidated return case. Right. My point was going to be that Ilfeld perhaps has been extended, you know, beyond its original purview. But, I mean, Ilfeld is the exact, you know, in the context of parent and subsidiary taking the same deduction for the same economic loss. I mean, that's exactly what we have here, and that's why we think Ilfeld controls. The behavior is the same, but the laws were different, right? When the deduction was taken in Ilfeld, there was a regulation or a statute, I forget which, that said you can't. And here, there seems to be a regulation that says you can, at least with respect to the stock sale, not an asset sale, but a stock sale. Okay, but the regulation that you're talking about in Ilfeld was not in play in the next case, the Pacific Lumber case. That went back to a 1921 Act provision. I thought that the 21 to 28 Acts, the 28 Act was, Section 23F, was similar to what we have in 165A today. Oh, yeah. It's the direct ancestor. In Pacific Lumber, which, by the way, was 1935, not 1936, that was my mistake, was based on a 1921 law, which was similar to what is today in 165A. Right. And our point is that even though the regulations didn't catch these 2002-2003 losses, they didn't affirmatively, I don't think they blessed them. But there's nothing inconsistent. I'm looking at Pacific Lumber again. The court determined that the deductions in that case were inconsistent with the governing statute. Right. And even the regs. Which is 165. I mean, well, the predecessor of 165. And that's what, I mean, we're saying the same thing. We're saying that Duquesne took these duplicate losses solely on the authority of 165. But they pointed to a regulation that allows it for the stock treatment. Again, the fact that the regulation is inapplicable or applies to a different situation, I think that's a little different than saying, like you have in the investment adjustment rules, where Woods Investment was just following, you know, okay, you are required to compute this basis. Explain that to me because I'm not understanding why the stock sale treatment was inconsistent with the regulation or that that regulation was addressing a different scenario. And you're talking about the 2002-2003? No, let's start with the 2001. I mean, the way they treated the stock loss in 2001, I mean, that was consistent with the stock regulation, right? Yes. All right. So their argument, as I understand what Mr. Martin was saying today, which kind of surprised me, because I have this listed in my notes. I have 2001 listed as the stock sale and 2002-2003 listed as the asset sale. So I was a little flummoxed when he got up here and told me that us, that 2002-2003 was stock. I got even more flummoxed when you said, and I appreciate your candor, that in fact, if you look at 2002 and 2003, some of it was stock and some of it were hard assets. That's my understanding. But, again, so if there is a regulation on point that allows the tax treatment of the stock loss in 2001, then why wouldn't that same analysis apply in 2002 and 2003 to the extent and only to the extent that those losses involve the sale of stock? Well, the rules that applied to the 2001 stock sale, as Council mentioned, you had a choice. You could either apply the old loss disallowance regulation without what's called the loss duplication factor. And that's our situation where you've got an asset, I'm sorry, a subsidiary that holds devalued assets where the losses have not been realized yet. So that was the loss duplication factor. So you had a choice. You could either apply the loss disallowance regulation without that loss duplication factor, or you could apply this 337D-2T, which, again, is aimed at a completely different scenario. That's targeting built-in gain. And we're talking about assets that have depreciated in value. So fast forward to 2002 and 2003, and now you've got two separate rules. You've still got the 337D-2T, which just doesn't apply to this fact situation. And then you've got this 35T, and the only reason that 35T doesn't apply to the 2002 and 2003 sales is that 35T is aimed at the 2001 stock sale, where you sell just a sliver of the stock, and the sub remains in the consolidated group, and then you recognize the losses again. So I just think that's different. You've got a reg that just on its face is not applicable. I think that's a little different than the basis adjustments that went into Woods Investment and cases like that. That's where I draw the distinction. Any further questions? Thank you very much. Mr. Martin, do you want to pick up where we left off, right there, as to whether the regulation on which you're relying primarily deals with gains and not losses? I don't think that's accurate, Your Honor. Because? Well, let me try to start at the beginning. Yes, because the 1337D-2 has a calculation in it that refers to the adjustment of basis offsets for income. It picks up the transactions that are involved where there's a loss, gain or not, and comes up with the amount of the loss that's allowed. It is directly on point here. And if this asset loss has created a misnomer, let me clarify that, that asset losses were reflected in the value of the stock. The value of the stock held by the corporation is where the deductions came from, and that involved an asset reconciliation of the kind that counsel was referring to. So the temporary reg said you've got an option here. One of the options is to use 1.337D-2T to make the calculation. But that says you do not disallow a stock loss that reflects net operating losses and asset losses of the subsidiary, right? Right, and it went on to prescribe how that would be calculated, and then you determine later whether you can take that at the consolidated level or not. Now, the loss duplication issue, which is referenced in 1016, is picked up by the basis adjustment rule 1.1502-32. That's how the IRS took care of the duplication. Now, what we've heard today is that in combination didn't – All of it. It's still in play today. It's how a parent basis in a subsidiary stock is – So it really struck it down, that portion which went beyond the consolidated context, or what? Rite Aid was directed at a different regulation that then went off the books. 1.1502-32 remained on the books, and it was the answer. What we've heard today is it wasn't a good enough answer. But that's why this isn't Ilfeld. It's not McLaughlin. It's more like United Dominion or Gitlet. If you want a better answer, you've got to redraft the regulations. But the fact that the taxpayer followed the existing regulations appropriately for the transaction, and again, the basis adjustments are made under 1.1502-32 to protect the government by reducing the basis and the calculation. If that needs improvement, okay. Now, in 2001, where the stock sale occurred, the IRS signed off on that. In 2002, we did exactly what we did in 2003 under the regulations I've described, and the IRS signed off on that. In 2003, the only reason they didn't sign off was Ilfeld. Not because we hadn't followed the regulations. In fact, they agreed with our basis adjustments that were their protection and signed off on that. So what we have is the same kind of ad hoc trumping here that was attempted in United Dominion and rejected. The IRS tried that again using 1016 in Woods Investment, and Woods Investment said no, not where there's a regulation that the taxpayer followed. But Mr. Calderwell is saying that they're not relying on 1016 today. Well, I'm saying that's not then a freestanding principle that will help them here. I mean, the point being, and that's why I said to you at the outset, Ilfeld seems to me, and maybe I'm wrong, just to be nothing more than an interpretive principle. But the principle is that if you are going to do something that takes deductions more than once for the same types of assets, either stock or asset sales, same types of things, that you need to have something that tells you specifically you can do it. It seems from what the government is saying is that with regard to what you've done, nothing told you that you necessarily couldn't do what you did on 1231.01 or in 02 or 03, at least that's the stock part of it. But nothing specifically tells you you could do it. And you're saying that the answer to that question is 32. 32 tells you you can specifically do what you did, both in 01, 02, and 03. Right. We need two sections. Okay, 32. What's the other one? 337D2T. And you know what Mr. Catterall's response is to that. Well, we were directed there by the IRS, so I'll stand by that. Okay. Now, let me make one other point. Let me ask you about the record because, like Judge Hardiman, I think based on your brief, it appeared to us that in 2000, I mean, as you say, in 2002, after Aquasource sold several groups of operating assets, DLH deducted capital losses. And then in 2003, after Aquasource sold its remaining assets, DHL followed the same controlling statutes and deducted the capital losses. The agency then declared that the portion of the asset sale losses that are duplicative of stock sales should be disallowed by application of bill filled. Right. And you're telling us today that we actually are not talking about losses or deductions that are related to asset sales but to stock sales. No. We are talking about losses and deductions that related to asset sales. The asset sales affected the value of the stock, the asset held by the consolidated company. So that... But the losses and deductions at issue related in 2002 and 2003 to asset sales. asset sales that affected the value of the stock, which is why 1337D2 applied, because the basis adjustment and the deduction came from the loss of value to the stock. That is what we would prove on remand if we were allowed to. The point of it here is that that would become clear if there was a factual record that compared the composition of values from the stock, from the assets, from the sales, traced forward from 2001 through 2003, and we could prove that these deductions were not duplicative. They were taken for independent reasons and authorized by the regulations. All that got trumped, Your Honor, by this ad hoc application of ILFO. That goes to your summary judgment arguments, and from the transcript of the first oral argument, I believe you conceded that that data, the data on which those arguments could have been made, was in your client's possession. But we didn't carry any burden on summary judgment to bring that data forward, Your Honor. The burden rested on the IRS to prove to justify the deductions. I'm sorry. I answered the wrong question. We justified the deductions. We justified them on the basis of the regulations and that they were allowed. If the IRS believed that they were duplicative, then it, as it admitted in the red brief, bore the prima facie burden of showing that. They didn't meet that burden. They didn't do any tracing. They didn't compare the assets in play and the value of the assets when the stock sale was made as to the value of the assets that were in play when the asset losses were incurred. Without that, you don't have a factual record to declare that this was, in fact, a double deduction. We at least have to go back for that. But doesn't the burden remain on the taxpayer to justify the proprietary deductions for the 2002 to 2003 deductions just as well as the 2001? Which we did by virtue of following the code. But for purposes of summary judgment, summary judgment, that burden is not on us. The IRS carries that burden affirmatively. And if they didn't meet it, of course, this Court's precedents establish that we don't have to come forward with any... Are you saying that the summary judgment, which I thought you wanted the Court to decide, that there's a material issue of disputed fact? Is that what you're saying? Can I make a three-part response to that? The first line we'd like the Court to say is, no deal fell, and therefore, the deduction should be affirmed. We want the Court to say, because we followed the regulations, Gottesman applies, so the deduction should be allowed. And we want the Court to say, if the regulatory compliance goes out, that there is a fact issue still here that requires resolution. The last thing I will say, there are two things. The ELA issue is not on the table. It's not part of the briefing or the argument. The 2001 stock loss... ELA. ELA, the loss issue that was described in counsel's argument, the excess loss allocation is not an issue that was used to justify this, nor was the 2001 stock loss involved in any part of this calculation. Bringing that back in is improper. Now, you heard Mr. Catterall's statement that, in fact, despite what was said on page 18 of the transcript of November 18, that essentially after 12-31-01, you were no longer acquiring assets. That doesn't take away the need for tracing, Your Honor, because what you have to do is look at the value of the assets on the time that the deduction was taken, and you can show that... So you're saying that even if you got those assets prior to 12-31-01, they were different assets than you had when you sold the 4.17 percent of stock to Lehman Brothers? Values changed, yes, Your Honor. And that makes a difference on whether the deductions were taken for the same economic loss. How do you write that opinion? Excuse me? How do I write that opinion without getting myself reversed by the Supreme Court? Well, by looking at the principle of tracing. I mean, here, in order to do a double deduction analysis, you'd have to know the composition, the value, and the adjusted basis of each asset at the time of the stock sale. Then you'd have to know the composition, the values, and the adjusted basis of each asset at the specific time it was sold. And finally, you'd have to look at the intervening events between the stock sales and the asset sales to see how that impacted the value. Only then could you make a determination that the deductions were taken for the same economic loss. That's the record we don't have. That's the record that we would get on remand. You wouldn't be reversed for saying that. You'd be applauded for saying it shouldn't be assumed. It needs to be proven. So let me conclude on that note. Thank you. And what we would ask, once again, if counsel could get together and have a transcript prepared of this oral argument and split the costs. And then two weeks from today, that is on the 26th, if you would submit by 4 p.m. no more than 10 single-spaced pages simultaneously as to the particular questions that we ask you to be prepared to deal with at oral argument, including, I would add, the provision in subsection 22 that I mentioned today. Thank you, Your Honor. Thank you.